**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1918

SHERITA MURPHY; JONATHAN MURPHY, JR., Individually; J.M.,
an Infant, by and through Sherita Murphy and Jonathan
Murphy, Jr., his Parents and Next Friends,

Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk. Robert G. Doumar, Senior
District Judge. (2:07-cv-00120-RGD-FBS)

Argued: March 23, 2010                    Decided: June 17, 2010

Before GREGORY and AGEE, Circuit Judges, and Eugene E. SILER,
Jr., Senior Circuit Judge of the United States Court of Appeals
for the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Laurie Michelle Higginbotham, ARCHULETA, ALSAFFAR &
HIGGINBOTHAM, Austin, Texas, for Appellants. Anita Kay Henry,
OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for
Appellee. **ON BRIEF:** Michael Archuleta, ARCHULETA, ALSAFFAR &
HIGGINBOTHAM, Austin, Texas, for Appellants. Dana J. Boente,
Acting United States Attorney, Alexandria, Virginia, for
Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arises from a defense verdict awarded in a medical malpractice case filed pursuant to the Federal Tort Claims Act against the United States on the basis of treatment received at the Naval Medical Center ("NMC") in Portsmouth, Virginia.[1] The district court entered judgment in favor of NMC because it found the Murphys failed to prove causation. For the reasons set forth below we affirm the judgment of the district court.

I.

On December 3, 2003, plaintiff Sherita Murphy went to NMC reporting fever, cramping, vaginal bleeding and other serious symptoms. A cursory examination of Murphy, who was twenty-six weeks pregnant, revealed an above normal heart rate and other symptoms indicating a bacterial infection known as chorioamnionitis, a diagnosis that was subsequently confirmed.

About four hours after her arrival at NMC, Murphy's contractions were occurring every two to four minutes. Despite the seriousness of her symptoms, however, NMC staff failed to conduct a pelvic exam until almost seven hours after she arrived

---

[1] For simplicity, we shall refer to the defendant as NMC even though the named defendant is the United States.

at the hospital.  It was at this time that hospital personnel discovered Murphy's baby was delivering at the perineum with a prolapsed umbilical cord.  Shortly thereafter, J.M. was born — limp, blue and without respiration or heart rate.

Despite the long wait and Murphy's classification as high-risk, NMC medical personnel failed to prepare adequately for the baby's delivery.  No radiant warmer was present in the birthing room (and one was not available until 10 minutes after J.M. was born), no oxygen equipment had been laid out for use and resuscitation personnel were not present.

J.M. was born with an omphalocele, a defect in which the bowel partly forms outside the body.  His "APGAR score was one at one minute, five at five minutes, and six at ten minutes." J.A. 1058.  At one to one-and-a-half minutes post-birth oxygen was delivered to J.M. via a manually operated positive pressure bag-valve mask.  Medical personnel encountered difficulty intubating J.M. because, a staff anesthesiologist noted, J.M.'s airway was "very anterior and extremely difficult to intubate." J.A. 1058.  It is unclear if or when the bag-valve mask was connected to mechanical oxygen though mechanical oxygen was administered at the time J.M. was finally intubated on the third attempt.  After intubation, J.M. experienced good chest wall rise and equal breath sounds bilaterally.  At two-and-a-half

4

minutes J.M. had a heart rate of 60 beats per minute ("bpm"), which increased to 120 bpm at four to five minutes post-birth.

J.M. suffers from cerebral palsy and has significant developmental delays. Sherita Murphy and her husband, Jonathan Murphy, filed suit individually and as next friends of J.M. alleging that multiple breaches in the standard of care by NMC personnel caused J.M.'s cerebral palsy.[2] At trial, the Murphys focused on NMC's alleged "failure to deliver the infant in an appropriate clinical setting; i.e., in a room with appropriate personnel and appropriate equipment for resuscitation." J.A. 1063. NMC did not seriously contest that the hospital and its staff breached various standards of care. Indeed, even NMC's expert, Dr. Dillard, agreed that the medical providers "were not ready for this baby." J.A. 907. Significantly, however, the Murphys conceded that NMC medical personnel did not contribute to J.M.'s prematurity or to his condition at the time of delivery.

Although the parties essentially agreed that an intraventricular brain hemorrhage most likely caused J.M.'s cerebral palsy, they disagreed as to the cause of the hemorrhage. The Murphys asserted that NMC's post-delivery

---

[2] The Murphys sought damages for J.M.'s physical injuries and their own damages for mental anguish and expenses resulting from the birth of a child with cerebral palsy.

5

breaches in the standard of care triggered an intraventricular hemorrhage which caused injury to J.M.'s brain. Specifically, the Murphys argued that J.M. suffered from hypoxia and hypothermia brought about by negligent resuscitation and that these two conditions caused his injuries.

NMC maintained throughout the case that despite the various breaches of care with respect to Sherita Murphy and J.M., the breaches did not cause J.M.'s injuries. At trial NMC maintained that J.M. suffered neither significant hypoxia nor hypothermia as a result of the resuscitative event and that J.M.'s prematurity combined with Mrs. Murphy's chorioamnionitis most likely caused the hemorrhage and the cerebral palsy.

After a three-day bench trial, the district court determined "that [NMC] breached the standard of care by failing to have appropriate resuscitation equipment and personnel immediately available upon the delivery of J.M." J.A. 1064. However, the district court also agreed with NMC's expert, Dr. Dillard, that (1) J.M. did not suffer from significant hypothermia, (2) J.M. did not suffer a hypoxic injury, and (3) NMC's lack of preparation for J.M.'s delivery did not result in

inadequate resuscitation.[3]  Accordingly, the district court concluded that the Murphys "have failed to prove that defendant's negligence was more likely than not the cause of J.M.'s injuries."  Id.  Based on these findings, the district court entered judgment for NMC.

The Murphys filed a timely appeal, alleging multiple errors by the district court.  Specifically, they argue the district court:  (1) reached a verdict that is against the clear weight of the evidence, (2) displayed bias and impermissibly restricted their experts' testimony, (3) improperly relied on evidence outside of the trial record, (4) erred in excluding NMC's policies and procedures from evidence, (5) erroneously applied Virginia law on the burden of proof of causation, and (6) failed to award damages and incorrectly ruled that the Murphys were not eligible for an award of damages in excess of the cap on damages under Virginia law.  We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

---

[3] The district court also determined that even assuming J.M. suffered from these conditions as a result of negligent resuscitation, the Murphys "have not proved that application of the standard of care would have prevented injury in this child, thus clearly not meeting the 'but for' requirement."  J.A. 1065.

II.

A.

The Murphys presented three experts on causation. Dr. Leichtman, a board certified pediatrician and clinical geneticist, testified that J.M.'s injuries were caused by several minutes of hypoxia and hypothermia that J.M. suffered during the resuscitation. Dr. Katz, a board certified pediatrician and pediatric neurologist, testified that J.M.'s injuries were caused by a "confluence of factors" around the time of birth, including the delayed resuscitation event. J.A. 1065. Finally, Dr. Edwards-Brown, a board-certified radiologist and neuroradiologist testified that the hemorrhaging was most likely caused by hypoxia and hypothermia, but her opinions were confined to the cause of the hemorrhaging, not the cause of the hypoxia. NMC presented the testimony of Dr. Dillard, who is board-certified in pediatrics and neonatal/perinatal medicine. Dr. Dillard testified that J.M.'s injuries most likely resulted from two causes: prematurity and Sherita Murphy's chorioamnionitis.

The Murphys assert the district court's judgment is against the clear weight of the evidence and on appeal they attack Dr. Dillard's credibility and the scientific basis for his opinions. In essence, the Murphys complain that the testimony of their three expert witnesses outweighs Dr. Dillard's testimony. We

8

disagree and, having reviewed the record as a whole, are of the opinion that the district court's findings are neither clearly erroneous, see Fed. R. Civ. P. 52(a)(6), nor against the weight of the evidence.

> Applying a clear error standard, we "will not reverse a lower court's finding of fact simply because we would have decided the case differently." Easley v. Cromartie, 532 U.S. 234 (2001) (internal quotation marks omitted). According to the Supreme Court, we can find clear error only if, "'on the entire evidence,' [we are] 'left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). We have identified clear error when we have determined that, "without regard to what the actual facts may be, the findings under review . . . are not supported by substantial evidence." Stanley v. Hejirika, 134 F.3d 629, 633 (4th Cir. 1998) (internal quotation marks omitted); see United States v. Whorley, 550 F.3d 326, 338 (4th Cir. 2008) (defining "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support" the finding under review).

United States v. Manigan, 592 F.3d 621, 631 (4th Cir. 2010) (alteration in original). "We review rulings on the admissibility of scientific evidence . . . for abuse of discretion." United States v. Prince-Oyibo, 320 F.3d 494, 497 (4th Cir. 2003).

The district court concluded that

> [p]laintiffs' experts provided scant explanation for their conclusions that hypoxia and hypothermia caused J.M.'s cerebral palsy. In contrast, defendant's expert, Dr. Dillard, gave detailed reasoning for his conclusion that J.M. suffered neither a hypoxic injury nor a hypothermic injury from the resuscitative event. Moreover, even assuming that resuscitation-related

9

hypoxia and hypothermia caused J.M.'s brain injury, plaintiffs have not proved that application of the standard of care would have prevented injury in this child, thus clearly not meeting the "but for" requirement.

J.A. 1065.

The district court found Dr. Dillard's "testimony in explaining the bases for his conclusions . . . to be more credible and reliable than those of the [Murphys'] experts." J.A. 1066. "[W]hen a district court's factual finding in a bench trial is based upon assessments of witness credibility, such finding 'is deserving of the highest degree of appellate deference.'"[4] Evergreen Int'l., S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008) (quoting U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 824 (4th Cir. 1992)).

On appeal, the Murphys reiterate on several occasions the claim that they presented "uncontroverted testimony that the delayed resuscitation of J.M. caused his hypoxia, which resulted in his Grade 4 intraventricular hemorrhage." Br. of Appellant at 14. The testimony cited by the Murphys, however, does not

---

[4] We note that Dr. Dillard was the only expert whose training and experience focused extensively on the care of sick newborn infants with birth defects and that he has published articles on the relationship between cerebral palsy and prematurity. Dr. Dillard has also been involved in researching the association between cerebral palsy and chorioamnionitis. Clearly, we cannot say the district court erred in affording Dr. Dillard's testimony significant weight.

10

support this conclusion. Dr. Dillard testified on cross-examination as follows:

> Q. And correct me if I'm wrong, but I believe you testified on direct examination that when a baby has a Grade 4 intraventricular hemorrhage, that's caused by low oxygen and low blood pressure?
>
> A. I think those are two things <u>that could definitely be associated</u> with a Grade 4 hemorrhage.

J.A. 899 (emphasis added). This testimony by Dr. Dillard does not address the Murphys' contention that a delay in resuscitation by NMC personnel caused hypoxia and J.M.'s brain hemorrhage. To the contrary, Dr. Dillard explicitly testified on direct examination as follows:

> Q. In your opinion did J.M. sustain any injury — well, first of all did J.M. have hypoxia?
>
> A. No. Well, let me put it another way. I'm sure, just as most babies did, he had hypoxia at birth which is almost universal, but the big question is did he have hypoxia to the extent that it caused injury.
>
> Q. Did he?
>
> A. No, he did not.

J.A. 880.

Dr. Dillard reiterated this point on cross-examination:

> Q. And you agree that hypoxia makes it more likely that a baby will have intraventricular hemorrhage?
>
> A. Again, it's a matter of degree of hypoxia. As I explained earlier, all babies have some

11

degree of hypoxia at birth, but of course all babies who are born prematurely and have hypoxia at birth don't develop intraventricular hemorrhage. It takes a significant degree of hypoxia to result in interventricular hemorrhage, and my contention is that this baby did not have significant hypoxia.

J.A. 902-03.

Dr. Dillard's conclusion that J.M. did not suffer a lack of oxygen significant enough to cause his brain hemorrhage and his resulting deficits is fully supported by the record. As the district court explained:

Plaintiffs have not proved by a preponderance of the evidence that application of the standard of care would have prevented any hypoxic injury that J.M. may have had. Plaintiffs experts testified that medical providers breached the standard of care by failing to have oxygen available at the moment of birth and failing to have "adequate" resuscitation personnel and equipment present at birth. Oxygen was however available at approximately one minute of life and the medical record discloses that positive pressure ventilation with bag-valve mask was begun immediately thereafter. The Court is troubled that plaintiffs' experts glossed over this early access to oxygen as if it could be ignored, indicating that four to five minutes passed before oxygen of sufficient quantity was administered. Given that the plaintiffs' experts did not address the bag-valve provision of oxygen, there is no testimony that this early provision of oxygen was insufficient for the purposes of preventing brain damage. Importantly, there is no evidence in the testimony or expert reports of the plaintiffs regarding the period of time that a neonate can sustain hypoxia without suffering brain injury.

J.A. 1076.

Although the Murphys acknowledge on appeal that "[o]xygen was not available to the baby until one minute of life, and was not provided via bag-valve-mask until 1½ to 2 minutes of life," they nonetheless draw the conclusion, entirely unsupported by their experts' testimony, that "[s]ince no oxygen was getting to his brain during this time period, J.M.'s brain hemorrhaged and was permanently damaged." Br. of Appellant at 5 (internal citation omitted). Only one of the Murphys' experts, Dr. Leichtman, broached the subject by testifying that "we generally like to get a resuscitation event over by one to three minutes." J.A. 611. As the district court explained, Dr. Leichtman did not testify that this threshold was significant enough to cause injury to a baby generally or to J.M. in particular. Moreover, Dr. Dillard stated that while adults can sustain brain injury after "just a minute or two or three," premature infants like J.M. could withstand injury from a lack of oxygen for "somewhat longer." J.A. 880.

In addition to countering the Murphys' experts' conclusions that hypoxia and hypothermia caused J.M.'s injuries, Dr. Dillard testified extensively about the causes of J.M.'s impairments. With considerable explanation Dr. Dillard concluded that "[a] variety of complications that are related to prematurity were significantly additive in the causation of [J.M.'s] cerebral palsy." J.A. 854. He also offered his opinion that "[t]he

13

mother's chorioamnionitis is strongly associated with the development of . . . Grade 4 hemorrhage[s] . . . ." J.A. 838. According to Dr. Dillard, various studies demonstrate that the association is "very statistically significant; meaning that there's less than a one-in-20 chance of there being, this occurring by chance alone." J.A. 838.

Not only did Dr. Dillard offer his own causation testimony with respect to prematurity and chorioamnionitis, he specifically rebutted the causation testimony offered by the Murphys' experts. The district court found this testimony credible and persuasive.

> Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy. In gauging the truth of conflicting evidence, [the factfinder] has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment, to prefer the testimony of a single witness to that of many.

Weiler v. United States, 323 U.S. 606, 608 (1945).

In short, the record contains ample evidence to support the district court's factual, legal and credibility determinations. Accordingly, we find no error.

14

The Murphys next assert that the district court harbored a bias in favor of NMC and against them, their experts, and medical malpractice suits generally. In support of this assertion they cite various rulings and statements by the district court as evidence of bias. As NMC points out, however, the Murphys never made a motion for recusal pursuant to 28 U.S.C. § 455, which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. 455(a)-(b)(1).

"The rule that an objection must be timely raised with the trial court to preserve the right of appellate review is elementary, and it is of long standing." United States v. Godwin, 272 F.3d 659, 672 (4th Cir. 2001). In this case, the Murphys failed to raise most of these issues with the district court and made no motion for recusal based on any alleged bias. Therefore, except for evidentiary rulings subject to a proper objection, any alleged errors are subject to plain-error review. See, e.g., United States v. Berger, 375 F.3d 1223, 1227 (11th Cir. 2004) ("Ordinarily, we review a judge's decision not to recuse him or herself for an abuse of discretion. However,

15

because [appellant] failed to seek recusal of the district judge in the proceedings below, we review his recusal request for plain error.") (internal citation omitted); United States v. Cruz-Mercado, 360 F.3d 30, 36 (1st Cir. 2004) ("[Appellant] neither objected to the[] comments nor sought recusal of the trial judge based on partiality, limiting our review to assessing only whether plain error occurred.").

Aside from several instances in which the district court restricted their admission of evidence or dealt with Murphys' counsel in what the Murphys consider a brusque, impatient or sarcastic manner (unreasonably in the Murphys' view), they offer only one specific statement by the district court that demonstrates a potential bias. In that instance the district court expressed its awareness of several doctors who had left the profession because of rising medical malpractice premiums. During a conversation with the Murphys' counsel concerning the court's refusal to admit NMC's policies and procedures into evidence, the district court made the following statement:

> The Court: And consequently in that particular case, the trial judge felt under his discretion that he could admit that particular rule. So far as it's discretionary I wouldn't admit it, because what I think is the standard is going to have to be the standard established for all the particular profession or the industry itself. If we start on this, then what we

16

> do is we actually get — I think oftentimes we get so often enmeshed in these things, I think it's important to understand that if you establish such a thing, what you do is decry people from making rules that are beneficial and you decry industries or companies from doing it. And it's, there is no question you do. Because once a lawyer's [sic] get ahold of it they say don't make a rule, don't do this, don't do that, you're going to get sued. <u>As it is right now, where are we with obstetricians? I think at least three of them I know have quit the profession because of the cost on the malpractice coverage which is 90-some thousand dollars a year.</u>

J.A. 748 (emphasis added). The district court's statement does not constitute plain error for several reasons.

The Supreme Court explained in <u>Liteky v. United States</u>, 510 U.S. 540 (1994), that

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. <u>See</u> <u>United States v. Grinnell Corp.</u>, 384 U.S., at 583. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, <u>judicial remarks during the course</u>

17

> of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They <u>may</u> do so if they reveal an opinion that derives from an extrajudicial source; and they <u>will</u> do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

<u>Id.</u> at 555 (emphasis added).

The district court's statement was made in the context of explaining its ruling refusing to admit NMC's policies and procedures. According to the district court, such materials do not constitute the standard of care in the industry but instead reflect the aspirational goals of the organization. In explaining its ruling to counsel, the district court was stating its belief that hospitals would not adopt such policies for fear of having them used at trial to establish a breach in the standard of care when, in fact, the standard of care reflects the standard in the medical community as a whole, not the standard at a particular institution.

Immediately after making the statement the district court elaborated that

> the question here in my mind is simple: Has the Portsmouth Naval Hospital violated the standards that are generally acceptable among the medical profession at the time and place of the incident in question? And did it cause the injuries of the plaintiff? And if so, to what extent? That's what we're really doing here.

18

J.A. 749. This statement by the district court makes clear that it was mindful of its duties and was entirely capable of rendering fair judgment. There is simply nothing in the record indicating that the district court held "a deep-seated favoritism or antagonism [towards the Murphys] that would make fair judgment impossible." Liteky, 510 U.S. at 555.

Our review of the record also leads to the conclusion that no error occurred with respect to the remaining conduct cited by the Murphys as examples of bias. Though some comments by the district court might be considered "stern and short-tempered," they fall within the categories of statements that will not constitute bias. Liteky, 510 U.S. at 556; see also id. at 555-56 ("Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.").

C.

The Murphys also claim they are entitled to a new trial because the district court relied on evidence outside the trial record.

> We have granted a new trial "only in the most extreme of cases" where a judge demonstrated personal bias against a litigant because of reliance on extrajudicial sources. <u>Aiken County v. BSP Div. of Envirotech Corp.</u>, 866 F.2d 661, 678 (4th Cir. 1989); <u>see</u> <u>generally</u> <u>Crandell v. United States</u>, 703 F.2d 74, 75-76 (4th Cir. 1983). And a court's consideration of material outside the record does not generally raise issues of constitutional magnitude. <u>See</u> <u>Aiken County</u>, 866 F.2d at 678 ("We do not think, however, that the two memoranda received by the judge and the ancillary <u>ex</u> <u>parte</u> contacts in this case approach the magnitude of constitutional error.").

<u>ePlus Tech., Inc. v. Aboud</u>, 313 F.3d 166, 178–79 (4th Cir. 2002).

As with the Murphys' previous allegations of bias by the district court, the record shows that they did not object when the trial judge informed them that he would be looking up the experts on the Internet to see "[w]hat their field of expertise is, what they have written, what they have not written." J.A. 95. Having failed to object, the question becomes whether the trial court's doing so (or at least saying it was going to do so) constitutes plain error. It does not. The most obvious reason no substantial error occurred is because, as NMC notes, the district court indicated it was going to review information on all the experts, not just the Murphys' witnesses. Moreover, the Murphys have made no showing of any prejudice by virtue of the district court's research, if indeed it occurred.

The Murphys also object to various other statements by the district court indicating an effort to read the materials

20

provided by the parties and referenced by the experts. Having reviewed these statements, we conclude they indicate little more than a diligent effort by the district court to absorb the vast amounts of medical information referenced or relied upon by the parties' experts. Conduct the Murphys consider "prejudicial," we believe illustrates conscientious attention to the district court's duties. Indeed, the Murphys concede that "[w]hen a fact finder relies on outside evidence, for the alleged bias and prejudice to be disqualifying, it must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." Br. of Appellant at 35 (emphasis added). The Murphys do not cite one statement in the district court's opinion as an example of "misconduct" and our review of the record reveals that the district court undertook its role as fact-finder quite seriously. Regardless of what materials it may have considered, its opinion falls easily within the confines of the evidence presented at trial.

D.

The Murphys further contend the district court erred in refusing to admit excerpts of NMC's labor and delivery manuals on the limited issue of causation. Relying on Riverside Hospital, Inc. v. Johnson, 636 S.E.2d 416 (Va. 2006), they assert that Virginia law allows the admission of a hospital's

21

written policies and procedures for such a limited purpose. We disagree.

In 1915 the Supreme Court of Virginia held that

> [a] person cannot, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common. Private rules may require of employ[e]es less or more than is required by law; and whether a given course of conduct is negligent, or the exercise of reasonable care, must be determined by the standard fixed by law, without regard to any private rules of the party.

Virginia Ry. & Power Co. v. Godsey, 83 S.E. 1072, 1073 (Va. 1915); see also Pullen v. Nickens, 310 S.E.2d 452, 457 (Va. 1983) (reaffirming Godsey and holding that State Highway Department's internal rules were inadmissible). This Court has previously recognized Virginia's longstanding rule in this regard and determined that "the Virginia rule is sufficiently bound-up with state policy so as to require its application in federal court." Hottle v. Beech Aircraft Corp., 47 F.3d 106, 110 (4th Cir. 1995).[5]

---

[5] The Murphys argue that we should review the district court's refusal to admit the policies and procedures de novo. NMC asserts that the district court's refusal to admit the material constitutes a ruling on the admissibility of evidence that is reviewed for an abuse of discretion. Because we have already determined that Virginia's preclusion of "policies and procedures," albeit evidentiary in nature, is substantive, our "review of a district court's interpretation or application of state law is de novo." Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 475 (4th Cir. 2005) (citing James v. Circuit City Stores, Inc., 370 F.3d 417, 421-22 (4th Cir. 2004)).

22

Even though the Murphys allege that they sought to introduce NMC's policies and procedures "for the limited purpose of establishing causation," they admit seeking the introduction of such evidence "because these manuals clearly establish that Government providers knew the standard of care would prevent the injury suffered by J.M." Br. of Appellants at 39. The Murphys also assert that in Riverside the Supreme Court of Virginia "ruled that the defendant hospital's policies and procedures were admissible over the same objection offered by [NMC] in this case." Br. of Appellants at 43.

As an initial matter, because the procedure manuals cannot be introduced to establish the standard of care, we fail to see how the information could show the "providers knew the standard of care" in the community as a whole would have prevented J.M.'s injuries. Moreover, Riverside does not stand for the proposition asserted by the Murphys because that case did not involve the hospital's "policies and procedures." As the Supreme Court of Virginia plainly stated, "the evidence of the staff orientation instruction and nursing curriculum, although dealing with the issue of fall-risk assessment and prevention, were not hospital policies or procedures of the type involved in Godsey and Pullen." Riverside, 636 S.E.2d at 422. In this case the Murphys sought to introduce excerpts from NMC's labor and delivery policy manuals which they admit constitute NMC's

23

"policy and procedure manuals."  Br. of Appellants at 39.

Accordingly, the district court correctly interpreted Virginia

law and did not err by excluding this evidence.

E.

The final claim of error we must consider is the Murphys'

claim that the district court erroneously applied Virginia law

on the burden of proof of causation.  They stress that under

Virginia law they were only required to prove it was more likely

than not that NMC's negligence was a cause of J.M.'s injuries,

not that it was the sole cause.  In other words, the Murphys

argue they were "not required to prove that hypoxia was 'the

only' cause of J.M.'s injuries, [but] rather 'a' cause of J.M.'s

injuries."  Br. of Appellants at 50.  The parties agree that our

review of the district court's application of state law is de

novo.  See note 5, supra.

The obvious problem for the Murphys is that, in the

district court's view, they failed even to prove that hypoxia

was "a" cause of J.M.'s deficits, much less "the" cause.  As the

district court explained:  "Dr. Dillard concluded that J.M. was

not exposed to a significant enough deprivation of oxygen during

the resuscitation event to cause a hypoxic injury in the brain."

J.A. 1072 (emphasis added).  According to the district court, it

"believed the testimony of Dr. Dillard while rejecting the

24

conclusions of the [Murphys'] experts." Id. Based on these factual findings, the district court concluded that

> [t]he reports and testimony [of the Murphys' experts] provided little in the way of any explanation or basis for their opinions that hypoxia and hypothermia resulted from defendant's failure to follow the standard of care for resuscitations, ultimately causing J.M.'s cerebral palsy. The Court hereby finds that [the Murphys'] experts' conclusions on the standard of care are credible, but further finds their conclusions on causation not credible.

J.A. 1078.

We agree with NMC that "[a]bsent credible proof of this essential factual predicate, any discussion of Virginia law on causation is irrelevant." Br. of Appellee at 54. We therefore conclude the district court did not err.[6]

### III.

Having reviewed the record, the parties' briefs, and the applicable law, and having had the benefit of oral argument, we find no error and, for the reasons stated herein, affirm the judgment of the district court.

AFFIRMED

---

[6] The Murphys make two final challenges to the district court's verdict in favor of NMC. They assert the district court erred by (1) failing to award damages and (2) ruling that their claims were subject to Virginia's cap on damages for medical malpractice awards. In light of our conclusion that the district court did not err in entering judgment for NMC, we need not address these issues.

25