**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1721**

FIRST PROFESSIONALS INSURANCE COMPANY,

        Plaintiff,

    v.

KYRSTEN E. SUTTON, MD,

        Defendant and 3rd-Party Plaintiff – Appellee,

    v.

THE MEDICAL PROTECTIVE COMPANY,

        Third Party Defendant – Appellant.

**No. 13-1722**

FIRST PROFESSIONALS INSURANCE COMPANY,

        Plaintiff - Appellee,

    v.

KYRSTEN E. SUTTON, MD,

        Defendant and 3rd-Party Plaintiff– Appellant,

    v.

THE MEDICAL PROTECTIVE COMPANY,

        Third Party Defendant.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:12-cv-00194-RMG)

———————————

Argued: January 28, 2015                    Decided: June 8, 2015

———————————

Before KING and FLOYD, Circuit Judges, and DAVIS, Senior Circuit Judge.

———————————

Affirmed in part and vacated and remanded in part by unpublished opinion. Senior Judge Davis wrote the opinion, in which Judge King joined. Judge Floyd wrote an opinion concurring in part and dissenting in part.

———————————

**ARGUED:** Gabriela Richeimer, TROUTMAN SANDERS LLP, Washington, D.C., for Appellant The Medical Protective Company.  George J. Kefalos, GEORGE J. KEFALOS, P.A., Charleston, South Carolina, for Appellee/Cross-Appellant Kyrsten E. Sutton, M.D.  Thomas C. Salane, TURNER PADGET GRAHAM & LANEY P.A., Columbia, South Carolina, for Appellee First Professionals Insurance Company. **ON BRIEF:** John T. Lay, Laura W. Jordan, Janice Holmes, GALLIVAN, WHITE & BOYD, P.A., Columbia, South Carolina; John R. Gerstein, TROUTMAN SANDERS LLP, Washington, D.C., for Appellant The Medical Protective Company.  Oana D. Johnson, GEORGE J. KEFALOS, P.A., Charleston, South Carolina, for Appellee/Cross-Appellant Kyrsten E. Sutton, M.D.  R. Hawthorne Barrett, TURNER PADGET GRAHAM & LANEY P.A., Columbia, South Carolina, for Appellee First Professionals Insurance Company.

———————————

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

These cross-appeals arise out of an insurance coverage dispute related to claims for alleged birth injuries resulting from professional negligence. Dr. Kyrsten Sutton attended the birth of Richard and Amy Moore's son, Nathan. The Moores filed suit in state court for medical malpractice against Dr. Sutton. Dr. Sutton's former insurers, First Professional Insurance Company ("FirstPro") and the Medical Protective Company ("MedPro") disagree as to which, if either, insurer owes Dr. Sutton a duty to defend the lawsuit; accordingly, FirstPro filed this declaratory judgment action in federal court. After a bench trial, the district court ruled that MedPro, but not FirstPro, has a duty to defend Dr. Sutton and pay damages as may be required under the MedPro policy. For the reasons that follow, we affirm in part and vacate and remand in part.

I.

A.

Dr. Sutton is a board certified obstetrician-gynecologist who has practiced medicine in South Carolina since 2000. She admitted Amy Moore to St. Francis Hospital in South Carolina for labor and delivery of her child, Nathan Moore, on June 22, 2004. When Nathan was born, he "was documented to be abnormally depressed with poor color, muscle tone, and respiratory effort,"

3

and "required resuscitation in the delivery room." J.A. 715. Eventually, he was transferred to the Medical University of South Carolina Hospital after experiencing seizures in the nursery.

After Nathan's birth, Amy Moore continued to be treated by Dr. Sutton. With respect to her son's prognosis, she told Dr. Sutton at first that Nathan's treating physicians were uncertain about it, but then "informed [her] that [they] expected him to have some deficits but they may be mild." Id. During a later visit with Dr. Sutton in August 2004, Amy Moore told her that Nathan's tests were expected to be normal and that Nathan's treating physician "was hopeful there would be little to no residual [health] problems." Id. at 716. During this time, Amy Moore never complained to Dr. Sutton about her care, treatment, or the delivery, and never expressed an intention to bring a lawsuit.

When Nathan was nearly four years old, Dr. Sutton received a letter from the Risk Management Department at St. Francis Hospital disclosing that it had received a request for Amy Moore's medical records from June 22, 2004 (the day Nathan was born). The letter noted that it was informing Dr. Sutton of the request because of "ongoing Risk Management activities to identify potential claims within our health care system." J.A. 596. The letter further stated that Dr. Sutton could review the

4

medical record, but gave no further details about any treatment or hospitalization provided.  At the time she received the letter, Dr. Sutton did not remember Amy Moore as her patient or the treatment she provided her; thus, the only information she knew about Amy Moore was contained in the St. Francis letter.

Critical to the district court's findings and conclusions in this case, Dr. Sutton testified that upon her receipt of the letter, she called her then-insurance company, MedPro, whose policy provided coverage from May 1, 2003 to May 1, 2009.  She further testified that during this call, she advised the MedPro representative with whom she spoke of the contents of the letter from St. Francis.  There is no documentation of this call in the files of MedPro, and Dr. Sutton has none.

In 2011, Dr. Sutton received a notice of intent to sue from counsel for the Moores, acting as parents and guardians ad litem of Nathan, for the injuries he suffered in connection with his birth ("the Moore Lawsuit").  She referred this claim to her then-current insurer, FirstPro, whose policy insured her from April 1, 2009 to April 1, 2012.

In January 2012, FirstPro filed a complaint based on diversity jurisdiction against Dr. Sutton in the District of South Carolina, seeking a declaratory judgment that FirstPro "has no duty to defend or indemnify [Dr.] Sutton for the claims made in the [Moore] Lawsuit."  J.A. 26.  FirstPro argues that

5

the claim is excluded from coverage based on three exclusions in the relevant policy. Only one of these provisions, Exclusion 11(b), was considered by the district court. That provision states that FirstPro refuses to "defend or pay" for injury or damages "arising out of a medical incident or committee incident which prior to the effective date of this policy was" "reported to an insurer." J.A. 644. FirstPro argues that this exclusion was triggered because Dr. Sutton's 2008 call to MedPro disclosing her receipt of the medical records request qualifies as a "medical incident" that was reported to another insurer.

In response to the declaratory judgment action, Dr. Sutton counterclaimed against FirstPro and filed a third-party complaint against MedPro, arguing that if FirstPro did not owe her coverage, then MedPro did. MedPro argues that it does not owe coverage to Dr. Sutton because it has no record of receiving the call from Dr. Sutton in 2008, and thus, Dr. Sutton failed to notify MedPro about the potential claim as required under the MedPro policy. MedPro's policy explicitly states that "the Company shall have no duty to defend or pay damages" "on a potential claim unless it was reported to the Company during the term of this policy and the report includes all reasonably obtainable information, including the time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of the patient

6

and any available witnesses." J.A. 592. Dr. Sutton denies that the medical records request put her on notice of a potential claim arising from her delivery of Nathan. In any event, she contends that her call was enough to relieve her of (or satisfy) her duty to report to MedPro a potential claim.

In due course, the Moores intervened as defendants and argued that FirstPro owed Dr. Sutton coverage for the Moore Lawsuit.[1]

B.

After the close of discovery, the insurers moved for summary judgment, each arguing, inter alia, that as a matter of law, it had no duty to provide coverage for the Moore Lawsuit. The district court denied both motions. With respect to MedPro's motion, the district court stated that there was a genuine issue of fact as to "whether Dr. Sutton reported the 2008 Letter to MedPro" and "whether the information allegedly provided by Dr. Sutton to MedPro was sufficient to report a potential claim regarding Nathan Moore." J.A. 135, 136. As to FirstPro's motion, the court stated that there was a genuine

---

[1] Counsel have disclosed that MedPro and the Moores have entered into an agreement under which MedPro will provide coverage no matter the outcome of this appeal, explaining that "[t]his agreement ensures that Dr. Sutton is not left without coverage and . . . is not personally exposed to a verdict . . . ." Reply Br. of MedPro at 11. We are satisfied that this agreement does not moot the disputes presented in this case.

issue of fact with respect to whether Dr. Sutton's phone call to MedPro regarding the St. Francis letter triggered Exclusion 11(b) of the FirstPro policy.

To resolve these issues of fact, the district court held a bench trial on March 2, 2013. It heard testimony from only two witnesses, Dr. Sutton and Joseph Costy, MedPro's claims specialist. Dr. Sutton testified to the following: (1) she called MedPro and notified the representative that she had received a medical records request letter from St. Francis Hospital; (2) she told the MedPro representative the name 'Amy Moore', gave the representative the date for which the medical records were being requested, and basically read the contents of the letter to the representative; (3) the MedPro representative did not instruct her to take any action with regard to the letter; (4) she received no follow-up communication from MedPro after she made the call; and (5) she did not follow up with St. Francis to review any medical records.

The district court then heard testimony from Costy, who testified as to the procedures of MedPro's call and claims system. He testified that he had conducted multiple searches of MedPro's records and could find no record of Dr. Sutton's call to the company call center in 2008, and that if Dr. Sutton had called, "the persons answering the phones in the call center were trained . . . to document any call regarding a possible

8

claim from a South Carolina insured by opening an electronic 'ticket' that was then forwarded to him as the assigned claims adjuster." J.A. 717. Upon questioning by the district court as to the reliability of these call center procedures, Costy testified that the call center staff and procedures were generally reliable.

Upon conclusion of the bench trial, the district court made several findings of fact. Critically, the district court found credible both Dr. Sutton's testimony that she called MedPro to report the contents of the St. Francis letter and Costy's testimony that he did not receive notification from the MedPro call center regarding Dr. Sutton's call. It further found that it was "more likely than not [that] the MedPro call center failed to follow company procedures to create an electronic 'ticket' regarding the call and to forward the information to Mr. Costy upon receipt of the call from Dr. Sutton." J.A. 719. It concluded that the "MedPro system is dependent upon the call center operators undertaking a series of tasks to start the claims process and, in light of Dr. Sutton's credible and specific memory of making the call to MedPro, the Court is unpersuaded from the evidence in the record that the system is free of human error generally or in this particular matter." J.A. 719.

In light of the above findings, the district court concluded that Dr. Sutton met her burden of showing that she provided MedPro timely and sufficient notice of a potential claim under the MedPro policy. With respect to FirstPro, the court concluded that Dr. Sutton's call to MedPro about the St. Francis letter qualified as a report of a medical incident to an insurer prior to the inception of the FirstPro policy, and as such, FirstPro met its burden of showing that it is entitled to exclude coverage under Paragraph 11(b) of its policy. Consequently, the court stated it was unnecessary to consider whether the exclusions under Paragraphs 11(a) and (c) of the FirstPro policy applied.

Following the district court's decision, MedPro timely appealed the district court's order that it had a duty to provide coverage for the Moore Lawsuit and Dr. Sutton filed a protective cross-appeal from the district court's order that FirstPro was under no duty to do so.

## II.

Because the district court's decision that the exclusion in Paragraph 11(b) of the FirstPro policy applied rested heavily on its factual determination that Dr. Sutton notified a MedPro representative of the contents of the St. Francis letter in 2008, we first address the MedPro appeal and then resolve Dr. Sutton's protective cross-appeal.

10

MedPro presents four bases for reversing the district court's judgment: (1) the district court erred as a matter of law in its interpretation of the MedPro policy; (2) the district court erroneously shifted the burden of proof from Dr. Sutton to MedPro; (3) the district court's factual determination that Dr. Sutton reported a potential claim to MedPro is clearly erroneous; and (4) the district court lacked impartiality while conducting the bench trial. None of MedPro's arguments are persuasive, and we therefore affirm the district court's ruling that MedPro has a duty to defend Dr. Sutton in the Moore Lawsuit.

A.

This Court "review[s] a judgment following a bench trial under a mixed standard of review — factual findings may be reversed only if clearly erroneous, while conclusions of law, including contract construction, are examined de novo." Roanoke Cement Co., LLC v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005). Under South Carolina law,[2] which takes a formalistic approach to the interpretation of contracts, "'insurance policies are subject to general rules of contract construction,' and therefore, [courts] 'must enforce, not write contracts of insurance and . . . must give policy language its plain,

---

[2] The parties agree that South Carolina law governs the construction of the insurance policies at issue in this case.

11

ordinary, and popular meaning.'" Bell v. Progressive Direct Ins. Co., 757 S.E.2d 399, 406 (S.C. 2014) (quoting Gambrell v. Travelers Ins. Co., 31 S.E.2d 814, 816 (S.C. 1983)). Thus, when a contract is unambiguous, "it must be construed according to the terms the parties have used." Id. (internal quotation marks omitted).

Under the MedPro policy, the insurer only has a duty to defend or pay damages on a potential claim that "was reported to [MedPro] during the term of the policy and the report includes all reasonably obtainable information, including the time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of the patient and any available witnesses." J.A. 592. In concluding that Dr. Sutton's 2008 call to MedPro satisfied this provision, the district court construed this provision in two ways that MedPro now challenges. First, it determined that Dr. Sutton had to show only substantial, not strict, compliance with the provision. And second, it found that specific information relating to "the time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of the patient and any available witnesses" need only be reported if that information is reasonably obtainable.

MedPro's reporting provision is properly understood as a condition precedent because an insured must perform the act of

12

reporting before MedPro's duty to defend or pay damages arises. See Springs and Davenport, Inc. v. AAG, Inc., 683 S.E.2d 814, 816-17 (S.C. Ct. App. 2009) ("A condition precedent is any fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance by the promisor can arise." (internal quotation marks omitted)). Contrary to the conclusion expressed by the district court, South Carolina law requires strict, not substantial, compliance with conditions precedent. See McGill v. Moore, 672 S.E.2d 571, 575 (S.C. 2009) (holding that party may not "circumvent the contracts condition precedent by arguing substantial compliance"). In light of the clear direction from the South Carolina Supreme Court that insureds must comply strictly with conditions precedent, the district court erred in finding that only substantial compliance was necessary.[3]

Notwithstanding the district court's error in determining what type of compliance was required, it did not err in determining that the policy requires the specific type of information listed to be reported only if that information is reasonably obtainable. MedPro argues that specific information relating to "the time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names

---

[3] The district court relied on non-South Carolina law in its conclusion that only substantial compliance was required.

13

and addresses of the patient and any available witnesses" must be reported under the reporting provision regardless of whether that information is reasonably obtainable or not. It therefore views the provision as a "non-negotiable minimum" for coverage.

MedPro's argument is strained, and ultimately unpersuasive, for two reasons. First, the most natural reading of the provision is that the phrase "reasonably obtainable" modifies all of the specific types of information that comes after it. See Schulmeyer v. State Farm Fire and Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003) ("When a contract is unambiguous a court must construe its provisions according to the terms the parties used; understood in their plain, ordinary, and popular sense."). Second, even if it can be said that the provision is ambiguous as to whether it requires the specific types of information to be reported regardless of whether they are reasonably obtainable, ambiguity must be construed against both the drafter of the provision and the insurer, i.e., MedPro. See Chassereau v. Global Sun Pools, Inc., 644 S.E.2d 718, 722 (S.C. 2007) (noting that a general principle of contract construction is that "a court will construe any doubts and ambiguities in an agreement against the drafter of the agreement"); Helena Chem. Co. v. Allianz Underwriters Ins. Co., 594 S.E.2d 455, 459 (S.C. 2004) ("Where the words of an insurance policy are capable of two reasonable interpretations, the construction most favorable

14

to the insured should be adopted."). Thus, the district court correctly interpreted the provision to mean that an insured must only give the specific types of information listed in the provision if that information is reasonably obtainable.

Viewing this provision as a whole, MedPro's duty to defend or pay damages on the Moore Lawsuit only arises if Dr. Sutton strictly complied with a reporting provision that required her to report a potential claim during the term of the policy and supply all reasonably obtainable information. Although it is undisputed that Dr. Sutton called MedPro during the term of the policy, the parties disagree as to whether she (1) reported a potential claim and (2) supplied all reasonably obtainable information.

Under MedPro's policy, a potential claim is "an incident which the Insured reasonably believes will result in a claim for damages." J.A. 593. MedPro argues that because Dr. Sutton has consistently denied reporting a "potential claim" as defined in the MedPro policy and has never believed that the letter described an incident that would result in a damages claim, she did not report a potential claim as required by the policy. Its argument, however, overlooks a critical point: the term "potential claim" is measured with respect to an objective, not subjective, standard. In this light, the proper inquiry is whether a reasonable person in Dr. Sutton's shoes would have

15

believed that the May 2008 letter from St. Francis Hospital described an incident that would result in a claim for damages. Cf. Matter of Anonymous Member of S.C. Bar, 432 S.E.2d 467, 468 (S.C. 1993) (explaining that Rule 1.7 of South Carolina's Rules of Professional Conduct, which states that "a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client," is measured under an objective test); Hook v. Rothstein, 316 S.E.2d 690, 703 (S.C. Ct. App. 1984) (interpreting the term "reasonably believes" in the context of medical malpractice under an objective standard of whether "a reasonable physician of the same branch of medicine as the defendant would have disclosed the risks under the same or similar circumstances"). Because a reasonable doctor could view a letter from a hospital's risk management department relaying a medical records request as a first step in a patient's decision to initiate litigation, the evidence here supports a finding that there could exist a reasonable belief that the incident would result in a claim for damages. Therefore, the district court did not err in determining that Dr. Sutton (even contrary to her own subjective state of mind) reported a potential claim under the terms of the policy.

16

We respect the views set forth in our good friend's thoughtful dissenting opinion. Contrary to the dissent's assertion, however, that "[t]his appeal turns on whether Dr. Sutton 'reported' a 'potential claim' to MedPro during the term of her policy," post at 1, the outcome of this appeal actually turns on the correctness, under the proper standard of review, of the district court's factual finding that Dr. Sutton did so.

Marshalling support from citations to caselaw[4] that nowhere makes an appearance in MedPro's briefs on appeal, and claiming that "the plain language of the [MedPro] policy requires a subjective/objective hybrid analysis," the dissent concludes

---

[4] Darwin Nat'l Assurance Co. v. Matthews & Megna LLC, 36 F. Supp. 3d 636 (D.S.C. 2014); Greenwich Ins. Co. v. Garrell, No. 4:11-CV-02743-RBH, 2013 WL 869602 (D.S.C. Mar. 7, 2013). Neither case constitutes controlling authority in this case, nor is either persuasive. The policies in both Darwin and Garrell include language that is explicitly subjective. For example, in Darwin, the policy language provided coverage for a claim only if the Insured had no basis "(1) to believe that any Insured had breached a professional duty; or (2) to foresee that any such wrongful or related act or omission might reasonably be expected to be the basis of a claim against any Insured." 36 F. Supp. 3d at 653 (emphasis added). Similarly, in Garrell, no coverage existed unless the Insureds had "a basis to believe that [the act or omission at issue], or any related act or omission, might reasonably be expected to be the basis of a claim." 2013 WL 869602, at *7 (emphasis added). In contrast, the policy language at issue here states that a potential claim is "an incident which the Insured reasonably believes will result in a claim for damages," with the term "reasonably" modifying the term "believes." Therefore, while the policy language at issue in Darwin and Garrell arguably directs a subjective/objective hybrid inquiry, no similar language compels such a dual inquiry here.

17

that MedPro owes Dr. Sutton no coverage because she disavowed any belief that she had done anything wrong that could give rise to a claim against her, and would summarily reverse the judgment against MedPro.

The dissent's application of such an extreme interpretation of the policy language yields harsh results. As the district court properly found, however, in reliance on the testimony of MedPro's own witness, had MedPro properly handled Dr. Sutton's telephone call upon learning the contents of the letter she received, the proper MedPro official would have obtained the records and, upon her review, immediately treated the matter as a potential claim. The policy language did not require the district court to blink at this compelling evidence.

The dissent's harsh result is not justified by any controlling authority. Not a single opinion from the South Carolina appellate courts or any federal court of appeals has adopted the dissent's insistence that the MedPro policy's use of the word "Insured" in its definition of "potential claim" requires such an extravagant reading as the dissent ascribes to it. Notably, the one published federal appellate case that presented an opportunity to deal with this MedPro policy language actually did not deal with it. See Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co., 639 F.3d 806 (8th Cir. 2011).

In Owatonna, the district court granted summary judgment in favor of the insured on the issue of whether the insured had an objectively reasonable belief that a claim would be filed and conducted a jury trial on the issue of whether the insured subjectively held that belief. 639 F.3d at 809. The policy language which necessitated this dual inquiry was materially different from the language at issue in this case. There, the claims made policy provided coverage for "any claim for damages" filed during the policy period and defined a "claim filed" as the receipt, by MedPro during the term of the policy, of "written notice of a medical incident from which [Owatonna Clinic] reasonably believes allegations of liability may result." Id. at 811.

After a trial, a jury found that the insured subjectively believed that a claim for damages would be filed. Id. at 809. MedPro appealed and the Eighth Circuit affirmed the judgment on the jury verdict without once mentioning the district court's underlying analysis of the relevant policy provision and, specifically, without any discussion of or any citation to legal authorities suggesting that the district court's analysis of the policy language was correct.

Thus, the dissent is correct in saying, as it does, post at 9, that "Owatonna is inapposite" but not because "the district court here never conducted this subjective/objective analysis."

19

<u>Id.</u>  <u>Owatonna</u> is inapposite because it tells us nothing about what the Supreme Court of South Carolina would do when it is called upon to interpret the MedPro policy language at issue here.[5]  As many precedents show, South Carolina favors coverage in its interpretation of insurance contracts.  <u>See, e.g.</u>, <u>M and M Corp. of S.C. v. Auto-Owners Ins. Co.</u>, 701 S.E.2d 33, 35 (S.C. 2010) ("Policies are construed in favor of coverage . . . .");

---

[5] Ironically, the ancestor of MedPro's "reasonably believes" clause is a classic <u>exclusion from coverage</u> found in many, if not all, automobile insurance policies, i.e., occurrence policies, not claims made policies.  This court is not without experience with so called "reasonable belief" provisions in automobile insurance policies.  <u>See</u> <u>Emick v. Dairyland Ins. Co.</u>, 519 F.2d 1317, 1325 n.12 (4th Cir. 1975).

In fact, the district court in <u>Owatonna</u> simply cited generally to an unpublished district court opinion applying Texas law, <u>Empire Indem. Ins. Co. v. Allstate County Mut. Ins. Co.</u>, Civ. No. 3:06–1415, 2008 U.S. Dist. LEXIS 37764, at *22–23, 2008 WL 1989452 (N.D. Tex. May 8, 2008) ("The Allstate policy also contains an exclusion provision that applies when any person uses 'a vehicle without a reasonable belief that that person is entitled to do so.'"), in reasoning that the term "reasonable belief" "in this context has an objective and subjective component."  <u>Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co.</u>, Civ, No. 08–417, 2009 WL 2215002, at *5 (D. Minn. July 22, 2009).  But the "context" is not the same; it is black letter law that the interpretation of <u>coverage provisions</u> is not the same as the interpretation of <u>exclusions from coverage</u>, not in South Carolina and not anywhere.  <u>See</u> <u>McPherson v. Mich. Mut. Ins. Co.</u>, 42 S.E.2d 770, 771 (S.C. 1993) ("[R]ules of construction require clauses of exclusion to be narrowly interpreted, and clauses of inclusion to be broadly construed.  This rule of construction inures to the benefit of the insured.");  Erik S. Knutsen, <u>Confusion About Causation In Insurance: Solutions for Catastrophic Losses</u>, 61 ALA. L. REV. 957, 967 (2010) ("Most American courts also interpret coverage clauses broadly and exclusion clauses narrowly.").

20

S.C. State Budget & Control Bd. v. Prince, 403 S.E.2d 643, 646 (S.C. 1991) ("[I]nsurance contracts are generally construed against the party who prepares them and liberally in favor of the insured."); Walde v. Ass'n Ins. Co., 737 S.E.2d 631, 635 (S.C. Ct. App. 2012) (same); Cook v. State Farm Auto. Ins. Co., 656 S.E.2d 784, 786 (S.C. Ct. App. 2008) ("In South Carolina, clauses of inclusion should be broadly construed in favor of coverage, and when there are doubts about the existence or extent of coverage, the language of the policy is to be understood in its most inclusive sense." (internal quotation marks omitted)).

Accordingly, we are unpersuaded by the dissent's arguments and hold that the district court did not err in discounting Dr. Sutton's ill-informed belief about the potential outcome of a lawyer's request for medical records for the treatment of one of her patients.

The only remaining question is whether Dr. Sutton supplied all reasonably obtainable information when reporting the potential claim. We note that this is a close question. The insurance provision lists specific types of information such as the "time, place and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of the patient and any available witnesses," J.A. 592, almost none of which Dr. Sutton relayed to the MedPro

21

representative she called in 2008. Although she fully reported the contents of the letter, she did not identify Amy Moore as her former patient or report any details about her labor and delivery of Nathan. Before reporting the contents of the letter to MedPro, she did not review Amy Moore's records because she had left the practice at which Amy Moore was her patient, and did not contact St. Francis Hospital to review any medical records. Therefore, the nature of the information she gave to MedPro was limited, although she could have obtained at least two sets of Amy Moore's medical records (the private practice's records and St. Francis Hospital's records). The district court reasoned that Dr. Sutton nevertheless complied with the terms of the provision because she relayed all information that was then known to her at the time of the call. It further stated:

> She could have obviously undertaken further inquiry and investigation to obtain additional information, with a consequential delay in reporting the St. Francis letter to Med Pro, but she provided Med Pro at the time of her call "all reasonably obtainable information" then available to her. Had her call received the proper company follow up, she would have most probably been requested to obtain (and would have had the duty to provide) a copy of the hospital and office notes to provide the company additional information concerning the nature of the claim and extent of the child's injuries. The St. Francis letter, with the name of the patient, the date of the hospitalization, and the reference to the matter as a "potential claim" by the hospital's Risk Management Department, provided Med Pro sufficient information to alert the company of a potential claim and to begin its claims processing. Med Pro had its duty to investigate the potential claim, which it would have

22

undoubtedly done had information concerning Dr. Sutton's report to the call center been conveyed to Mr. Costy. Thus, the Court finds that Dr. Sutton complied with the notice requirements . . . .

J.A. 725-26.

We accept the district court's finding that Dr. Sutton testified credibly that she made the call "shortly after" receiving the letter. In light of its finding, it was not clearly erroneous for the court to find, as it did, that the information described above regarding the details of Amy Moore's treatment was not reasonably obtainable. Thus, the further finding that its disclosure was not required to trigger coverage is likewise not clear error. This is especially so considering that there was testimony that had the call been properly processed, Costy would have followed up with Dr. Sutton to provide additional information. This suggests that both Dr. Sutton and MedPro had a continuing duty to provide information and to investigate the claim, and that the term "reasonably obtainable" must be measured with respect to the time period during which the information was being given.

In sum, the district court did not commit clear error in finding that Dr. Sutton provided all reasonably obtainable information as required by MedPro's reporting provision. It therefore did not err in its legal conclusion that Dr. Sutton

23

complied with the required reporting provision under the MedPro policy.

B.

Next, MedPro argues that, as a matter of law, Dr. Sutton's uncorroborated testimony that she called MedPro in 2008 and reported the contents of the St. Francis letter was insufficient to carry her burden of proof to show that she met MedPro's reporting requirement. But the cases it cites in support of its argument are inapposite. For example, MedPro relies on S.C. National Bank v. Lumbermens Mut. Cas. Co., 526 F.Supp. 94 (D.S.C. 1981), in which the district court held that the defendant insurer failed to carry its burden of establishing that notice of cancellation of the policy was mailed to plaintiff, where defendant "had neither a certificate of mailing nor a record or any notation in its file to show that notification was actually mailed to Plaintiff." Id. at 95 . It also cites a tax reporting case in which the Tenth Circuit held that "absent some proof of an actual postmark or dated receipt, a presumption that tax documents allegedly mailed to the IRS were in fact received does not arise based solely upon a taxpayer's self-serving testimony." Sorrentino v. IRS, 383 F.3d 1187, 1195 (10th Cir. 2004). But these cases involve self-serving testimony that a litigant mailed notice or some other legally significant paperwork. In the context of mailing, there

24

is usually some other objective evidence, such as a copy of the paperwork mailed, receipt of mailing, or proof of postmark that accompanies a mailing. Cf. id. at 1195 (noting that "the taxpayer is in the best position with the clock running to protect himself by procuring independent evidence of postmark and/or mailing, whether by mail receipt, corroborating testimony, or otherwise"). By contrast, in the context of phone calls, there is usually no similarly accessible corroborating evidence that one expects to record the fact of making a phone call. Thus, the district court's reliance on Dr. Sutton's testimony, which it found to be credible, is not unreasonable under the circumstances of this case.

Additionally, MedPro relies on the reasoning of Feldman v. Charlotte-Mecklenburg Board of Education, No. 3:11-cv-34-RJC-DSC., 2012 WL 3619078 (W.D.N.C. Aug. 21, 2012), for the proposition that "[c]ourts should put aside self-serving testimony from a plaintiff where it is unsupported by corroborating evidence and undermined by other credible evidence." Id. at *5 . But here, although there is no corroborating evidence that Dr. Sutton called MedPro in 2008, there is no credible evidence that undermines her testimony of having the "specific memory of sitting at her desk with the letter and calling MedPro to report the receipt of this correspondence." J.A. 719. The only evidence that could be

25

viewed to undermine this testimony is the testimony from Costy that there was no record of a call from Dr. Sutton to the MedPro call center in 2008. But whether any member of this panel might have reached the same finding is of no moment; the district court found that evidence of "a number of different persons performing call center duties" and "turnover in those positions and phones being answered by trainees" showed that MedPro's system was prone to "human error or a failure to follow standard company procedures," J.A. 718, and that therefore testimony that MedPro received no call from Dr. Sutton in 2008 did not undermine her otherwise credible testimony. In this light, although Dr. Sutton's specific testimony of calling MedPro in 2008 is uncorroborated, there is evidence in the record to explain why MedPro might not have had any record of such a call that is consistent with Dr. Sutton having called and reported the contents of the letter. It is surely unremarkable to observe that a litigant's credible testimony alone may be sufficient to carry the burden of proof. See, e.g., United States v. Jones, 977 F.2d 105, 111 (4th Cir. 1992) ("There may be circumstances under which a defendant's self-serving testimony, uncorroborated by other testimonial or documentary evidence, about events this distant in time could properly be thought to carry his heavy burden of proof . . . .").

Considering that MedPro's cited cases in favor of its argument are inapposite, that there was no credible evidence in the record that undermined Dr. Sutton's credible and specific testimony of making the call to MedPro, and that there was evidence in the record to support the district court's finding of potential human error in MedPro's call center, we conclude that the district court did not err in finding that Dr. Sutton carried her burden to show that she complied with the reporting provision of the MedPro policy.

C.

MedPro next argues, in what amounts to a restatement or variation on its sufficiency challenge to the district court's factual findings, that the district court should not have relied on Dr. Sutton's testimony that she called MedPro to report her receipt of the medical request letter. As we have said repeatedly, we review a district court's factual findings for clear error. Roanoke Cement, 413 F.3d at 433. A finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Jiminez v. Mary Washington Coll., 57 F.3d 369, 379 (4th Cir. 1995) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact

27

simply because it is convinced that it would have decided the case differently." United States v. Heyer, 740 F.3d 284, 292 (4th Cir. 2014) (internal quotation omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Id. (internal quotation omitted). Indeed, as we have said: "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." FTC v. Ross, 743 F.3d 886, 894 (4th Cir. 2014); see also Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996) ("On review, we may neither weigh the evidence nor judge the credibility of witnesses."); Pigford v. United States, 518 F.2d 831, 836 (4th Cir. 1975); United States v. Bagdasian, 291 F.2d 163, 166 (4th Cir. 1961).

MedPro attacks the district court's finding that Dr. Sutton reported a claim to MedPro in two ways: (1) by arguing that the district court failed to consider the self-serving nature of Dr. Sutton's testimony and (2) by arguing that the district court erroneously found that MedPro's procedures were subject to human error. The first assertion is not reviewable on appeal as it

28

essentially asks this Court to review the district court's finding that Dr. Sutton was a credible witness. See Benner, 93 F.3d at 1234.

MedPro's second argument about the district court's finding on the reliability of MedPro's procedures is reviewable. It argues that there was insufficient evidence in the record of the unreliability of MedPro's reporting procedures. The district court found that human error was possible in MedPro's reporting procedures because of turnover; MedPro sought to rebut that finding by arguing that the only evidence of turnover stemmed from Costy's testimony that one of the call center employees with whom he had been talking had been on the job for only a year. It is true that the testimony of Costy is alone a thin basis for determining that there existed a high rate of turnover that affected the reliability of the call center, and there does not appear to be other evidence of turnover of employees at the call center. But the district court relied on more than just evidence of turnover in concluding that the call center was prone to human error — it relied on records produced at trial that showed that a number of different persons were performing call center duties and that phones were being answered by trainees. In this light, although the question is close one, there is sufficient evidence for a finding of unreliability, and

the district court's finding was plausible when viewed in light of the entire record. See Heyer, 740 F.3d at 292.

Furthermore, after finding both Dr. Sutton and Costy's testimony credible, and reviewing records about trainees answering the phone, the district court reasonably inferred that the most probable cause for Costy's lack of documentation of Dr. Sutton's call was human error in the call center. The district court is entitled to draw such reasonable inferences during a bench trial. Cf. United States v. Bishop, 740 F.3d 927, 935 (4th Cir. 2014) ("In reviewing the district court's judgment, we are mindful that, as the trier of fact, that court was in a better position than we are to evaluate the credibility of witnesses, take into account circumstances, and make reasonable inferences.").

Thus, although the evidence supporting the district court's finding that MedPro's reporting procedures were unreliable is not particularly robust, we cannot say it reaches the outer limit of the deferential standard for clear error. The district court could plausibly find that MedPro's procedures were prone to unreliability and that this unreliability explained why Costy did not receive receipt of Dr. Sutton's call to MedPro to report the contents of the St. Francis letter; the district court, therefore, did not err.

D.

30

MedPro's last assignment of error is that the district court denied MedPro a fair trial by manifesting bias in favor of Dr. Sutton. "Although courts do not generally address the standard of review applicable to assessing judicial bias, we should conduct a plenary review of such an issue because it raises due process concerns." ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 178 n.12 (4th Cir. 2002). But, because MedPro failed to raise the issue of bias in the proceedings below and failed to make a motion for recusal, "any alleged errors are subject to plain-error review." Murphy v. United States, 383 F. App'x 326, 332 (4th Cir. 2010) (unpublished).

As to a district court's questioning of litigants during bench trials, we have stated:

> The judge, for example, is entitled to propound questions pertinent to a factual issue which requires clarification. He may intercede because of apparent inadequacy of examination or cross-examination by counsel, or to draw more information from relevant witnesses or experts who are inarticulate or less than candid. This privilege or duty, however, is subject to reasonable limitations. A trial judge must assiduously perform his function as governor of the trial dispassionately, fairly, and impartially. He must not predetermine a case . . . .

Crandell v. United States, 703 F.2d 74, 77-78 (4th Cir. 1983). MedPro argues that the district court's questioning of Costy and Dr. Sutton revealed a predetermination that Dr. Sutton had reported the contents of the St. Francis letter to MedPro in 2008. This is not so. MedPro's characterization of "grilling"

31

Costy with "extensive" questioning is not borne out by the trial transcript. There were only three periods during Costy's testimony in which the district court asked questions, which can hardly be viewed as extensive or overwhelming for Costy. It is clear that the district court's purpose in asking these questions was to gain greater insight into the procedures used by MedPro to document incoming calls from insureds. Specifically, the district court questioned Costy as to the reliability of MedPro's reporting procedures — something that counsel had not yet specifically addressed in great detail in its questioning of Costy. Its questioning, therefore, did not reveal a prejudgment in favor of Dr. Sutton as much as an intent to understand what procedures might have or have not been in place that could explain Dr. Sutton credibly testifying that she had placed the call and Costy credibly testifying that MedPro lacked documentation of such a call.

MedPro further contends that the district court's hostility towards Costy during its questioning also reveals bias against MedPro and in favor of Dr. Sutton. But we discern no such hostility. In fact, the district court explicitly stated in its findings of fact that it found Costy's testimony to be credible, and during the bench trial, the district court stated that it found Costy to be "a very fine [and very honest] witness." J.A. 356. And, although the district court certainly followed up

32

Costy's responses with additional questions, its questioning was measured; indeed, the district court stopped questioning Costy on a particular point when he stated that he did not know or was unsure of the answer. MedPro therefore cannot show hostility towards Costy that evinces a bias against MedPro or in favor of Dr. Sutton.

In any event, hostility towards or critical questioning of one party does not in and of itself equate to bias:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

Liteky v. United States, 510 U.S. 540, 555 (1994). What MedPro actually challenges is the district court's opinion and judgment stemming from the testimony of Dr. Sutton, that Dr. Sutton testified credibly, and its resulting inquiry into MedPro's reporting procedures based on that reasoned opinion. But without a scintilla of evidence that the district court formed these judgments on the basis of "extrajudicial sources," see id., these determinations must be challenged on their merits, not on the basis of bias.

\* \* \*

33

In sum, MedPro has failed to point to persuasive indications that any one of its bases for reversal of the district court's judgment has merit. We therefore affirm the district court's judgment that MedPro has a duty to defend Dr. Sutton against the Moore Lawsuit and pay damages as may be required under its policy.

## III.

Although we are not required to do so, see supra n.1, in the interest of a thorough treatment of the issues presented by the parties, we next address Dr. Sutton's protective cross-appeal of the district court's judgment that FirstPro has no duty to defend Dr. Sutton in the Moore Lawsuit. The district court found that Dr. Sutton's call to MedPro constituted a report of a medical incident to an insurer prior to the inception of the FirstPro policy, which triggered Exclusion 11(b) of the FirstPro policy.

The legal issue presented here is narrow: whether Dr. Sutton's call to MedPro to convey the contents of the St. Francis letter constitutes a report of a medical incident under the FirstPro policy. Dr. Sutton correctly contends that the district court's finding that Dr. Sutton gave MedPro notice of a potential claim does not automatically mean that Dr. Sutton reported a medical incident under exclusion 11(b) of the FirstPro policy. That is because the terms "notice" and

34

"potential claim" are not necessarily equivalent to the terms "report" and "medical incident."

Whether an exclusion is triggered is a question of contract construction that we review de novo. See Roanoke Cement Co., 413 F.3d at 433. "Insurance policy exclusions are construed most strongly against the insurance company," and FirstPro, as the insurer, "bears the burden of establishing the exclusion's applicability." Owners Ins. Co. v. Clayton, 614 S.E.2d 611, 614 (S.C. 2005).

Exclusion 11(b) of FirstPro's policy reads:

We will not defend or pay under this coverage part for:

* * *

11. Any injury or damages:

> b. arising out of a medical incident or committee incident which prior to the effective date of this policy was:
>
> I. reported to any insurer; or
> II. a pending claim or proceeding; or
> III. a paid claim

J.A. 644. As FirstPro points out, this provision is a "prior knowledge provision" which is designed to ensure that insurers do not "contract to cover preexisting risks and liabilities known by the insured." Bryan Bros. Inc. v. Continental Cas. Co., 419 F. App'x 422, 425 (4th Cir. 2011) (unpublished). "Thus, it is generally the insured's duty to provide truthful

35

and complete information so the insurer can fairly evaluate the risk it is contracting to cover."  Id.

"Medical incident," as defined by the FirstPro policy, means "any act, error or omission in the providing of or failure to provide professional services to a patient by [the doctor] or by persons described in the Individual Professional Liability Coverage Part for whom [the doctor is] determined to be legally responsible."  J.A. 636.  Of particular importance to this case is that the policy treats "all bodily injury(ies) caused by a course of treatment(s) of a patient or of a mother and fetus (or fetuses) from conception through postpartum care" as a single medical incident.  J.A. 637.  The term "report" or "reported" is not defined by FirstPro's policy in the same manner as "medical incident."  Because the FirstPro policy does not define the term "reported," we look to its "commonly accepted meaning." Bardsley v. GEICO, 747 S.E.2d 436, 440 (S.C. 2013).  According to the Oxford English Dictionary, the verb "to report" is commonly defined as "to give an account of (a fact, event, etc.)," "to describe," or "to convey, impart, pass on (something said, a message, etc.) to a person as knowledge or information." Oxford English Dictionary Online (last visited April 17, 2015) (saved as ECF opinion attachment).  As FirstPro points out in its brief, it is therefore commonly understood as communicating or conveying information to someone, synonymous with the term

36

"to inform." Against this background, when Dr. Sutton called MedPro to convey the contents of the St. Francis letter, she "reported" the information in the letter.

But she did not necessarily report a "medical incident" as defined by the FirstPro policy. Beyond reporting the contents of the St. Francis letter, which merely identified Amy Moore as a patient who visited Dr. Sutton on June 22, 2004, Dr. Sutton did not report to MedPro any details about the acts she performed, any treatment she provided, or any potential errors or omissions that arose during her interactions with Amy Moore. The sparse information provided, detailing merely the fact that Amy Moore was a patient of Dr. Sutton's, can hardly be said to describe a medical incident. Because the policy defines "medical incident" as "any act, error, or omission in the providing of . . . professional services," it contemplates the reporting of acts, errors, or omissions beyond the mere fact of a doctor's provision of professional services. We therefore decline to adopt FirstPro's argument that reporting the mere fact of having seen a patient can qualify as a "medical incident" when that report includes no description of any acts, errors, or omissions that took place during the provision of services. Thus, Dr. Sutton's call to MedPro to report the contents of the St. Francis letter does not trigger the exclusion in 11(b) of the FirstPro policy.

Although the exclusion in 11(b) is not applicable, we remand to the district court to determine (if the case is not otherwise resolved) whether the exclusion in 11(c) of the FirstPro policy applies, an issue the district court did not reach. That exclusion states that FirstPro will not defend or pay for any injury or damages "arising out of a medical incident or committee incident disclosed or which should have been disclosed on our applications, renewal applications, or during the application or renewal process." FirstPro argues that Dr. Sutton should have disclosed the Moore medical incident in response to two questions in the application for insurance. Question 5(a) of the Application states: "Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that any of the following circumstances might reasonably lead to a claim or suit being brought against you, even if you believe the claim will not have merit: a request for records from a patient and or attorney related to an adverse outcome." J.A. 597. Relatedly, Question 7 of the application states: "Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that there are outstanding incidents, claims, or suits (even if you believe the outstanding claim or suit would be without merit) that have not been reported to your current or prior professional liability carrier." J.A. 597. Dr. Sutton responded "no" to these

38

questions.    J.A. 597.    We remand to the district court to determine whether it was reasonably foreseeable that the St. Francis medical records request letter might reasonably lead to a claim or suit being brought against Dr. Sutton and whether the claim arising from the birth of Nathan Moore was reasonably foreseeable, thereby triggering the exclusion in 11(c).

IV.

For the reasons set forth, the judgment is

AFFIRMED IN PART AND
VACATED AND REMANDED IN PART.

FLOYD, Circuit Judge, concurring in part and dissenting in part:

I agree with all of the majority opinion except for its conclusion that Dr. Sutton reported a potential claim as defined by the MedPro policy. I therefore dissent from part II.A. of the majority opinion.

## I.

This appeal turns on whether Dr. Sutton "reported" a "potential claim" to MedPro during the term of her policy – a condition precedent to coverage. J.A. 592. The policy defines a potential claim as "an incident which <u>the Insured reasonably believes</u> will result in a claim for damages." J.A. 593 (emphasis added). Both below and here on appeal, Dr. Sutton has consistently denied believing that she ever reported such a claim. Because South Carolina law requires strict compliance with conditions precedent, her admission would seem to end the matter. But the majority concludes her subjective belief is irrelevant, and instead misconstrues the policy as imposing a solely objective test.

I disagree for two reasons. First, the plain language of the policy requires a subjective/objective hybrid analysis. And second, even assuming that a purely objective standard applies, the record is devoid of any evidence or factual findings supporting the majority's conclusion that a reasonable physician

40

in Dr. Sutton's shoes would have viewed the medical records request as a first step to a medical malpractice action. Accordingly, I would reverse.

## II.

As my friends in the majority correctly recognize, South Carolina law requires that we enforce insurance contracts according to their plain terms.  Maj. Op. at 11-12 (citing Bell v. Progressive Direct Ins. Co., 757 S.E.2d 399 (S.C. 2014)). Here, MedPro's policy defines a "potential claim" as "an incident which the Insured reasonably believes will result in a claim for damages."  J.A. 593.  By focusing on the Insured's reasonable belief, this language requires a mixed subjective/objective analysis.  First, did the Insured believe the relevant incident would result in a claim for damages?  If the answer to that question is yes, we turn to the second question:  is that belief reasonable?  Here, Dr. Sutton denies believing that the records request would lead to a claim for damages.  Accordingly, we never get past the first step.[1]  As such, I would hold that Dr. Sutton failed to comply with the

---

[1]  The word "reasonably" modifies the phrase "believes will result in a claim for damages."  Because Dr. Sutton never had any such belief we need not consider whether her non-existent belief is reasonable.

41

notice requirements in the MedPro policy, and so MedPro does not owe her any coverage.

Courts that have interpreted similar insurance policy language repeatedly apply a similar two-step subjective/objective inquiry. See Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind., No. CIV. 08-417DSDJJK, 2009 WL 2215002, at *5 (D. Minn. July 22, 2009), as amended (Aug. 10, 2009), aff'd in part, 639 F.3d 806 (8th Cir. 2011) (holding that a MedPro policy conditioning coverage on receipt of notice of an incident which the insured "reasonably believes allegations of liability may result" requires both "an objective and subjective" analysis); Darwin Nat'l Assurance Co. v. Matthews & Megna LLC, 36 F. Supp. 3d 636, 653-54 (D.S.C. 2014) (applying a hybrid subjective/objective standard in analyzing so-called "prior knowledge" provisions in insurance contracts, which exclude coverage for unreported incidents predating the policy period which the insured knew or should reasonably have known would give rise to a claim); Greenwich Ins. Co. v. Garrell, No. 4:11-CV-02743-RBH, 2013 WL 869602, at *7 (D.S.C. Mar. 7, 2013) (citing Seiko v. Home Ins. Co., 139 F.3d 146, 152 (3rd Cir. 1998)) (same).[2]

---

[2] Cf. Am. Cont'l Ins. Co. v. Phico Ins. Co., 512 S.E.2d 490, 493 (N.C. Ct. App. 1999) ("The policy sets up a subjective standard . . . under which a claim is deemed filed if the (Continued)

Yet the majority concludes the MedPro policy calls for an "objective, not subjective, standard." Maj. Op. at 15. According to the majority, the "proper inquiry" is "whether a reasonable person in Dr. Sutton's shoes" would have believed that the medical records request "described an incident that would result in a claim for damages." Maj. Op. 15-16. But that is not what the policy says. Rather, the policy plainly states that Dr. Sutton's reasonable belief controls. Simply put, the majority is not free to rewrite the definition of a "potential claim" by swapping the phrase "what a reasonable person in Dr. Sutton's shoes believes" for the phrase "what the Insured reasonably believes." See, e.g., Torrington Co. v. Aetna Cas. & Sur. Co., 216 S.E.2d 547, 550 (S.C. 1975) ("[P]arties have a right to make their own contract and it is not the function of this Court to rewrite it or torture the meaning of a policy to extend coverage never intended by the parties.").

The majority only musters two cases purportedly supporting its conclusion that the phrase "reasonably believes" means an objective analysis applies: In re Anonymous Member of the South Carolina Bar, 432 S.E.2d 467 (S.C. 1993), and Hook v. Rothstein,

insured reasonably believes that an express demand for damages will be forthcoming. Therefore, we must view Ms. Chapman's actions to determine whether she . . . had a reasonable belief that a suit would be filed in the Watson case.").

43

316 S.E.2d 690 (S.C. Ct. App. 1984).  In my view, both are inapposite.  Neither addresses contract law, much less language in insurance policies similar to the language at issue here.  And both are distinguishable on their facts.

In In re Anonymous Member of the South Carolina Bar, the court addressed Rule 1.7 of the South Carolina Rules of Professional Conduct.  That Rule states that "a lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client."  432 S.E.2d at 468.  The court concluded this Rule sets up an objective standard.  But the court did not do so, as the majority implies, because the phrase "reasonably believes" per se requires an objective analysis.  Rather, it did so only because the comment to that Rule expressly states that conflicts governed by the Rule are to be measured under the view of a "disinterested lawyer."  See id.  In contrast, nothing in the MedPro policy states that a potential claim should be measured under the view of a "disinterested insured" – rather, the policy is clear that the view of "the Insured," Dr. Sutton, controls.

Hook v. Rothstein is similarly inapposite.  That case establishes that whether a physician departed from a standard of reasonable medical care in a lack-of-informed-consent action is

44

evaluated under the same objective standard applicable to medical malpractice actions. 316 S.E.2d at 703. Standards for medical malpractice and lack-of-informed-consent actions have no bearing on the meaning of a "potential claim" as expressly defined in MedPro's policy.

Admittedly, South Carolina courts have yet to interpret identical contractual language in a published opinion. Contrary to the majority's assertion, however, I do not believe they would apply a purely objective standard. The plain language of the policy states that Dr. Sutton's reasonable belief controls – not, as the majority concludes, the belief of "a reasonable person in Dr. Sutton's shoes." Because South Carolina courts enforce insurance contracts according to their plain terms, Bell, 757 S.E.2d at 406, I am confident they would join courts in other jurisdictions considering similar language and apply a two-part subjective/objective analysis.

The district court also appeared to recognize that the two-step inquiry applies in some instances. In fact, it applied an analogous inquiry in analyzing FirstPro's claim that Exclusion 11(a) in its policy precluded coverage. J.A. 116. That exclusion states that FirstPro will not defend or pay for any injury or damages arising out of claims made before the effective date if Dr. Sutton "knew or could have reasonably foreseen from the facts, reasonable inferences or circumstances

45

that a claim might be made." J.A. 647. As the district court acknowledged, this language contains "both a subjective and objective element." J.A. 116.

Yet the district court concluded that Dr. Sutton's subjective belief was entirely irrelevant under the similar language in MedPro's policy, i.e. whether she "reasonably believe[d]" that an incident would "result in a claim for damages":

> Well, she might not have a reasonable belief of a lawsuit, I understand your argument there, but the purpose of the notice provision is to protect, to bring it to your attention so you can do the investigation during the policy period. And now you want to turn it into some, Oh, no, if there is not a subjective belief by the insured that she's going to get sued, then we don't have to do it. I'm sorry.

J.A. 108. In doing so, the court – like the majority – ignored the plain language of MedPro's policy and instead rewrote it to reflect its purported "purpose." Because courts "must enforce, not write contracts of insurance," Bell, 757 S.E.2d at 406 (quotation omitted), the district court erred as a matter of law. Accordingly, I would reverse.


### III.

Even assuming an objective standard applies as the majority contends, nothing suggests that this standard was satisfied here. As an initial matter, the district court never applied an

46

objective standard. Rather, it concluded that the notice provision was satisfied because MedPro – not Dr. Sutton – would have considered the medical records request to be a "potential claim." J.A. 102-10, 136, 390.[3] In doing so, the district court rewrote the policy's definition of a "potential claim" to read "an incident which <u>MedPro</u> reasonably believes will result in a claim for damages." Again, the court was not free to rewrite the policy in this way. <u>See</u> <u>Hutchinson v. Liberty Life Ins. Co.</u>, 743 S.E.2d 827, 829 (S.C. 2013) (stating that courts can interpret, but not rewrite, provisions in insurance policies).

The district court relied on <u>Owatonna Clinic-Mayo Health Sys. v. Medical Protective Co.</u>, 639 F.3d 806 (8th Cir. 2011) for this point. <u>See</u> J.A. 136. But that case is inapposite. In <u>Owatonna</u>, the district court held that a MedPro policy with similar notice language required a subjective-objective analysis. 2009 WL 2215002, at *5. The district court granted summary judgment as to the objective component, and held a trial on the subjective component. <u>Id.</u>; <u>see also</u> 714 F. Supp. 2d 966, 967 (D. Minn. 2010). MedPro appealed only the district court's

---

[3] Similarly, the court concluded that after Dr. Sutton reported the medical records request to MedPro, MedPro was then responsible for investigating whether the request amounted to a potential claim triggering coverage, regardless of Dr. Sutton's subjective belief that it would not lead to a claim. J.A. 136.

47

ruling on the objective component, but did not appeal the jury's findings as to the subjective component.[4]

The Eighth Circuit rejected MedPro's assertions, concluding that the insured's belief that it would be sued was objectively reasonable. 639 F.3d at 813. At a minimum then, Owatonna establishes that the district court should have applied an objective analysis here (which it failed to do). And the Eighth Circuit only declined to address the subjective component because MedPro did not raise that issue on appeal.[5] As such, Owatonna does not support the district court's decision to ignore the subjective inquiry required by the plain language of the MedPro policy (and indeed the objective inquiry as well).

Finally, there is little, if any, evidence in the record that a reasonable physician would have believed that the medical

---

[4] MedPro also made an additional argument on appeal: that the insured's notice failed to literally comply with the requirements of the notice provision because it did not include any names, addresses, or other details required by the policy. 639 F.3d at 811-13. The Eighth Circuit disagreed, concluding that the insured's notice provided sufficient facts to put MedPro on notice of a claim under Minnesota law. Id. at 812-13. The district court here appears to have relied on this portion of the Eighth Circuit's analysis (see J.A. 136), while overlooking the portion of the Eighth Circuit's opinion analyzing whether the insured's belief that a claim would be filed was objectively reasonable.

[5] 639 F.3d at 810-11 ("In our case . . . the only issue on which there was a trial was the matter of the [Insured's] subjective belief, as to which there was no doubt as to the sufficiency of the evidence, and as to which, more relevantly, there is no issue raised on appeal.").

48

records request would result in a claim for damages. In fact, the district court's findings in the related context of FirstPro's Exclusion 11(a) suggest just the opposite: that a reasonable physician would not have believed the request would result in a claim. For example, in denying FirstPro's motion for summary judgment, the district court found that the "record evidence suggests that a reasonable physician would not view a request for records by an attorney as a definite sign of an impending claim." J.A. 139. And at trial, the court denied Dr. Sutton's motion for a directed verdict as to this Exclusion, finding that additional evidence was needed as to whether Dr. Sutton's belief was objectively reasonable. J.A. 260-62. Ultimately, the court determined a different exclusion applied as to FirstPro, and thus never decided whether Dr. Sutton's belief was objectively reasonable under Exclusion 11(a). The court's comments, however, suggest that this was a much closer issue than the majority suggests. See, e.g., J.A. 363 (inquiring why there was "no evidence [as to] what a reasonable physician would have" believed).

Moreover, unrebutted testimony established that requests for medical records typically do not give rise to medical malpractice claims, but rather arise in other contexts, such as worker's compensation claims or personal injury lawsuits. J.A. 104; 208-09. Thus, as I read the record, equally strong

49

evidence exists that a reasonable physician would not have viewed the medical records request as a first step to a medical malpractice action.  In any event, the district court never undertook this fact-intensive inquiry.  Accordingly, assuming an objective standard applies as the majority contends, I would remand to the district court to decide whether Dr. Sutton's belief was objectively reasonable in the first instance.

## IV.

For the above reasons, I respectfully dissent from Part II(a) of the majority opinion.